IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EYA DEAN, et. al., | ) | CV F 07-492  AWI SMS |
| | ) | |
| Plaintiffs, | ) | ORDER ON DEFENDANTS' |
| v. | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| THE CITY OF FRESNO, et. al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This case arises from the death of Charles Dean ("Dean") while in the custody of the Fresno County Jail.  Dean died from complications of cocaine ingestion.  Plaintiffs are the spouse and children of Decedent and originally filed suit in the Fresno Superior Court.  After a denied summary judgment motion, a granted motion for judgment on the pleadings, and the filing of an amended complaint that added federal causes of action, Defendants the City of Fresno ("Fresno") and Fresno police officers Curtis Davis ("Davis") and Frank Borrego ("Borrego") removed to this Court. Defendants now move for summary judgment on all claims.  For the reasons that follow, Defendants' motion will be granted in part, and the case will be remanded to state court.

# FACTUAL BACKGROUND[1]

On December 16, 2002, Davis and Borrego were on patrol when, at 12:27 a.m., they received a radio report of gunshots being fired near MLK Ave. and Church Ave.  See DUMF Nos. 1-2.  While en route to the location, a woman contacted the officers and advised them that she heard gunshots in the area of Calwa Ave. and Bardell Ave.  See DUMF No. 3.  Almost immediately thereafter, the officers saw a car heading northbound on Bardell at a high rate of speed.  See DUMF No. 4; Borrego Deposition at 13:23-14:3.[2]  The officers caught up to the car, identified it as a black Honda Civic, saw the license plate number, activated their overhead lights and attempted to make a traffic stop.  See DUMF Nos. 5-6.  The Civic continued eastbound at approximately 20 m.p.h. and did not yield to the officers.  See DUMF No. 7.  The officers saw the lone occupant of the Civic moving and reaching around in the car.  DUMF No. 8.  The Civic then turned southbound and pulled to the shoulder of the road.  See DUMF No. 9.[3]  At about 12:42 a.m., the officers made contact with the Civic driver, Dean.  DUMF No. 10.  Borrego was the primary investigating officer and Davis was a backup officer.  DUMF No. 15.  Dean gave the officers permission to reach into his jacket pocket after informing the officers that he had a pager. See Plaintiff's Exhibit O at p. 3.  Borrego located and removed a pager, $198.00, and what appeared to be a $10 amount of rock cocaine from Dean's jacket.  DUMF No. 12.  Borrego showed Dean the rock cocaine.  DUMF No. 13.  Also located in the car was an empty prescription vial that contained what appeared to be cocaine residue.  DUMF No. 14.  Based on

---

[1]"DUMF" refers to Defendants' Undisputed Material Facts and "PUMF" refers to Plaintiff's Undisputed Material Facts.  Plaintiffs' facts were numbered in response to Defendants' facts and thus, begin with "95" and end with "270."

Also, PUMF Nos. 165-270 appear to be reproductions of each paragraph of Plaintiffs' medical expert's (Dr. Frawley) declaration and police procedures expert's (Roger Clark) declaration.  Many of these PUMF's duplicate other PUMF's or DUMF's.  Given the redundancy of many of these PUMF's, that neither Frawley nor Clark have first hand knowledge of the events, and neither Frawley nor Clark cite to the specific source for their "factual assertions," the Court will not rely on these PUMF's with respect to establishing the factual background.

Finally, both parties make numerous objections to evidence or undisputed facts, for example both parties often object that a proposed undisputed fact is unduly vague or irrelevant.  Unless otherwise discussed, to the extent that the Court relies on evidence or a party's proposed undisputed fact, any objection thereto is overruled.

[2]All deposition citations refer to the deposition excerpts provided as exhibits by Plaintiffs..

[3]The Civic drove about 2 blocks before pulling over.  See Davis Deposition at 43:24-44:2.

the evidence found and on his training and experience, Borrego arrested Dean for possession of narcotics for sale, transportation of a controlled substance, and possession of a controlled substance – all felonies.  See DUMF No. 16.  Borrego informed Dean that Dean was being arrested on these charges.[4]  DUMF No. 17.

Dean was placed in the patrol car.  While sitting in the back seat, Dean advised Borrego that Dean had vomited in the car.  DUMF No. 18.  Borrego asked Dean how he was doing, to which Dean responded that he was fine and that he had had a bad drink.  DUMF No. 19.[5] Borrego did not smell alcohol on Dean.  See Plaintiffs' Exhibit O.  Borrego then continued his paperwork and "did not keep an eye on" Dean while Dean was in the car.  See Borrego Deposition at 26:14-24.  Dean then told Borrego the he felt ill again and Borrego rolled down the windows of the patrol car.  See DUMF No. 20.  Borrego opened the rear door and Dean attempted to vomit, but only had dry heaves.  DUMF No. 21.  At that point, Borrego did not ask Dean anything further about why Dean vomited.  See Borrego Deposition at 27:9-11.  Because of the vomit on the floorboard of the car, Borrego requested a transportation wagon to pick Dean up and transport him to the Fresno Police Department Identification Bureau for processing.  DUMF No. 22.  While waiting for the wagon, Dean and Borrego stood outside of the patrol car and talked.  DUMF No. 23.  When Borrego asked Dean if he knew what was going on, Dean did not answer.  See Plaintiff's Exhibit O at 3.  While waiting for the wagon, Dean did not appear to be in any physical distress or ill in any way.  See DUMF No. 24.[6]  Borrego again asked Dean how he felt, to which Dean responded that he was fine.  DUMF No. 25.  Borrego also gave Dean *Miranda* warnings.  See DUMF No. 26.  Dean indicated that he understood his rights, but did not

---

[4]It also appears that Dean was driving with a suspended license.  See Plaintiff's Exhibit O at 3.

[5]Plaintiffs object that it is irrelevant that Dean said that he was fine.  However, as discussed *infra*, all of Dean's statements to police are very relevant to the qualified immunity analysis regarding Plaintiffs' Fourteenth Amendment medical care claim.  See Watkins v. City of Battle Creek, 273 F.3d 682, 684-86 (6th Cir. 2001).

[6]Plaintiffs dispute DUMF No. 24 by pointing out that Dean vomited and then dry heaved and did not respond when asked if he knew what was going on.  DUMF 24 actually begins, "During this time."  In context, the DUMF refers to the time while waiting for the wagon, see Defendants' Motion at 3:15-20, which is why the Court has modified the wording.  Waiting for the transportation wagon is a post-vomit and dry heaving activity.  Further, that Dean did not give an answer does not show distress.  DUMF No. 24 is undisputed

want to give the officers a statement.  See DUMF No. 27.  At approximately 1:16 a.m., Dean was driven to Police Headquarters in a transportation wagon, while Borrego and Davis drove in their patrol car.  DUMF No. 28.[7]

After arriving at headquarters, Borrego looked at the vomit on the floorboard of the patrol car, and saw what appeared to be four to six $5 pieces of rock cocaine in the vomit.  DUMF No. 29.  Borrego had begun to think that, if there had been cocaine in the prescription vial, Dean might have hidden cocaine in his mouth or maybe could have ingested cocaine.  See Plaintiffs' Exhibit J at 21.  Borrego showed Davis the rock cocaine.  DUMF No. 30.  Borrego retrieved the substances with disposable tweezers, and booked it into evidence at headquarters.  DUMF No. 31.  Borrego told Dean that he had located what appeared to be rock cocaine in his vomit, but Dean did not respond.  DUMF No. 32.  Borrego never searched Dean's mouth or had Dean open his mouth.  PUMF No. 101.  Based on their training and experience, as well as the events that had taken place up to that point in time, the officers declared that they believed that Dean had hidden the cocaine rocks in his mouth at some time prior to or during their contact with him.  See DUMF No. 33.  Dean never informed the officers that he had swallowed cocaine, even after he was told that he was arrested for drug possession and had been told that Borrego had found apparent cocaine rocks in the vomit.  See Borrego Declaration at ¶ 13; DUMF No. 34.  Borrego and Davis also testified that they did not think, or it did not occur to them, that Dean needed medical attention.  See Borrego Deposition at 34:25-35:2; Davis Deposition 69:19-24.  The officers declared that if Dean had indicated that he had swallowed cocaine, they would have requested the necessary medical care.  See Borrego Declaration at ¶ 13; Davis Declaration at ¶ 9.  Dean was then photographed and fingerprinted without incident.  DUMF No. 36.  While at police headquarters, Borrego again asked Dean how he was doing.  DUMF No. 37.  Dean responded that he was "fine."  DUMF No. 38.  Dean then put his shoes back on, was handcuffed, and placed into the officers' patrol car.  DUMF Nos. 39-40.  The officers then drove Dean to the Fresno

[7]Plaintiffs object that there is no evidence that Dean was driven to headquarters at 1:16 a.m.  However, Davis and Borrego both declared that this occurred.  They had knowledge because they were with Dean at the traffic stop, while waiting for the wagon, when the wagon arrived to transport Dean, were with Dean at headquarters, and drove him to the jail.  The officers are percipient witnesses and their testimony is sufficient to establish the fact.

County Jail, where at about 2:24 a.m., he was turned over to jail personnel for booking. DUMF No. 41. Borrego and Davis then returned to their substation to end their shift. DUMF No. 42.

When the officers took Dean to the Jail, they understood that the first step in processing an arrestee into the jail consisted of a medical screening conducted by a jail nurse and if the arrestee has any medical concerns they can be communicated to the jail nurse. DUMF No. 46. Borrego and Davis understood that the jail would not accept an arrestee who had an injury or medical condition that would require medical treatment. DUMF No. 47. They further understood that the arrestee will receive the necessary medical attention by jail medical staff.[8] DUMF No. 48. Borrego did not tell anyone at the jail that Dean had vomited or that there were multiple pieces of rock cocaine in the vomit. See PUMF Nos. 116-117. According to Fresno Police Chief Dyer, if an arresting officer is aware that a suspect is ill, he has an obligation to so notify the nurse at the jail. See Dyer Deposition at 98:21-99:7. Officers report the medical condition of an arrestee so that the jail nurse can make an informed decision and assessment of whether to receive that person into the jail or perhaps to have the individual transported to the hospital. PUMF No. 155. The jail nurse should know if an arrestee has vomited and rock cocaine was in the vomit. PUMF No. 156.

According to the Coroner's Report, at approximately 2:48 a.m., Dean suffered a seizure while being booked at the Fresno County Jail and was transported via ambulance to University Medical Center. DUMF No. 43. Dean was pronounced dead several days later on December 20, 2002. See DUMF No. 44. According to the Autopsy Report, the cause of death was, "Complications of seizures following cocain use." Plaintiff's Exhibit E. The next line of the Autopsy Report states, "Sustained when the Dean ingested a toxic amount of cocaine at approximately 0040 hours on [December 16], 2002 . . . ." Id. If Dean had been treated for cocaine ingestion while he was still conscious and alert, it is highly likely that he would not have

---

[8] Plaintiffs PUMF No. 104 cites to a policy that appears to require police officers to provide a complete synopsis of the circumstances surrounding the arrest to the nurse. Defendants object that PUMF No. 104 is based on Exhibit M and Exhibit M was effective as of 2005. Defendants are correct that since the events of this case took place in late 2002, Exhibit M was not in force. PUMF No. 104 is not established and Plaintiffs' Exhibit M will not be considered.

1  died.  PUMF No. 217.

2       Also at 2:48 a..m., Fresno Police Sergeant Tucker, who appears to have been Borrego and

3  Davis's immediate supervisor on December 16, 2002, was advised that Dean had suffered a

4  seizure and was being taken to the hospital.  See Plaintiffs' Exhibit H.  After learning that Dean

5  was having seizures, Borrego advised Sergeant Tucker that Dean had swallowed some rock

6  cocaine prior to being arrested.  PUMF No. 99.  Borrego also told Tucker that Dean had vomited

7  and that there were pieces of rock cocaine in Dean's vomit.[9]  PUMF No. 119.  Tucker was

8  concerned by what Borrego told him.  PUMF No. 120.  If Tucker had known that Dean had

9  vomited rock cocaine, he would have called an ambulance.  See Tucker Deposition at 29:9-15.

10      Borrego attended the police academy at Fresno City College in 1995 where he received

11 his Basic POST certificate.  DUMF No. 49.  Borrego was hired as a police officer by the Fresno

12 Police Department in 1997.  DUMF No. 50.  Prior to the time of the subject incident, Borrego, in

13 some capacity, had arrested approximately 100 people for being under the influence of a

14 controlled substance.  See DUMF No. 51.  Davis attended the police academy at Fresno City

15 College in 1995 where he received his Basic POST certificate.  DUMF No. 52.  Davis was first

16 hired as a reserve officer by the Fresno Police Department in 1994.  DUMF No. 53.  Davis was

17 hired as a full time officer in 1999.  DUMF No. 54.  Prior to the time of the subject incident,

18 Borrego, in some capacity, had arrested approximately 100 people for being under the influence

19 of a controlled substance.  See DUMF No. 55.  Prior to this incident, Borrego and Davis had

20 received additional training through the Fresno Police Department field training program, on-the-

21 job training, advanced officer courses and other classes and seminars that they had attended.

22 DUMF No. 56.  This training included: (1) conducting evaluations to determine if a person is

23 under the influence of a controlled substance, including rock cocaine; (2) requesting aid for

24 persons in need of medical care; (3) recognizing an arrestee's need for medical care and

25 providing such care; (4) efforts suspects may make to hide controlled substances, including

26 putting such substances in their mouths.  DUMF No. 57.  Borrego and Davis had been trained

27

28    [9]It is not clear exactly when Borrego provided this information to Tucker, although it appears to have been shortly after 2:48 a.m.

1  that if they have a reasonable belief that a suspect has swallowed a controlled substance, such as

2  rock cocaine, they should render medical aid, contact emergency medical services and/or

3  transport the suspect to the hospital.  DUMF No. 58.[10]

4          During their approximately 1 hour and 42 minute contact with Dean, Dean conversed

5  with Borrego and Davis in a normal fashion.  DUMF No. 59.[11]  Dean appeared to understand their

6  questions and statements to him, and he responded appropriately.  DUMF No. 60.  Again,

7  however, Dean did not respond to Borrego when Borrego asked Dean if he knew what was going

8  on as they waited for the transportation wagon.  See Plaintiff's Exhibit O at 3.  With the possible

9  exception of vomiting, neither officer made any objective observations of Dean that would lead

10 them to believe that he was under the influence of a controlled substance.[12]  See DUMF No. 61.

11 The officers also had the opportunity to observe Dean walk, get in and out of a patrol car and

12 wagon, sit, stand, put shoes on, and comply with the photographing and fingerprinting process at

13 headquarters.  DUMF No. 62.[13]  With respect to these activities (walking, standing, entering and

14 exiting vehicles, etc.), Dean's behavior was normal and at no time did he appear to have any

15 difficulty in doing these things.  See DUMF No. 63.  At no time during the officers' contact with

16 Dean did he tell them that he had swallowed cocaine, or any other controlled substance.  DUMF

17 No. 64.  Other than telling the officers that he felt ill again (after having informed them that he

18 had vomited in the back seat of the car), see DUMF No. 20, Dean never stated that he was

19 experiencing any type of physical distress.  See DUMF No. 70.  Dean never told the officers that

20 he required any medical attention.  DUMF No. 66.  At no time during the officers' contact with

21 _____

22      [10]Plaintiffs state that it is disputed whether Borrego and Davis received that training.  However, there is no
    supporting evidence cited by Plaintiff.  Simply saying that there is disputed issue of material fact does not create one.

23  See Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Carmen Guadalupe v. Agosto, 299 F.3d 15,
    23 (1st Cir. 2002).  DUMF No. 58 is undisputed.

24
        [11]Plaintiffs argue that this fact is disputed, in part, because Borrego and Davis were with Dean for over 2

25  hours and 20 minutes.  That is not accurate.  The evidence establishes that Borrego and Davis made contact with
    Dean at 12:42 a.m., see DUMF No. 10, and dropped him off at the jail at 2:24 a.m.  See DUMF No. 41.

26
        [12]Borrego did not note in the arrest report whether Dean appeared to be under the influence of any drugs.

27  PUMF No. 107.

        [13]However, Davis could not recall if he was watching when Dean was removed from the patrol car.
28  See Plaintiff's Exhibit O at 8.

1    Dean did he appear to have any physical distress, other than the occasion when Dean vomited

2    and then shortly thereafter dry heaved.  See DUMF No. 68.  When asked on a few occasions (as

3    described above), Dean responded that he felt fine.  See DUMF No. 69.

4         At all times relevant, it has been the policy of the Fresno Police Department to comply

5    with the minimum officer training requirements as outlined by POST.  DUMF No. 78.  Fresno

6    police officers receive training in the police academy, field training programs, on the job training,

7    advanced officer courses and various classes and seminars offered throughout the State of

8    California.  DUMF No. 79.  The Fresno Police Department has a training unit that ensures that

9    Fresno police officers receive training in compliance with POST.  DUMF No. 80.  The training

10   provided to Fresno police officers meets or exceeds POST guidelines.  DUMF No. 81.  This

11   training has included: (1) conducting evaluations to determine if a person is under the influence

12   of a controlled substance, including rock cocaine (for those officers involved in narcotics

13   investigations); (2) requesting aid for persons in need of medical care; (3) recognizing an

14   arrestee's need for medical care and providing such care; and (4) efforts suspects may make to

15   hide controlled substances, including putting such substances in their mouths.  DUMF No. 82.

16   Fresno police officers have been trained that if they have a reasonable belief that a suspect has

17   swallowed a controlled substance, such as rock cocaine, they should render medical aid, contact

18   emergency medical services or transport the suspect to the hospital.  DUMF No. 83; 161.  Fresno

19   police officers are also taught that: (1) ingestion of cocaine can cause death, PUMF No. 147; (2)

20   arrested persons may have evidence in their mouth, PUMF No. 148; (3) persons arrested on drug

21   charges may attempt to conceal the illegal drugs on their person, PUMF No. 149; and (4) officers

22   are to be suspicious of those arrested and what the arrestees say.  PUMF Nos. 139-140.[14]

23        At the pertinent time, the Fresno Police Department had the following policies: Standing

24   Order 3.7.1 Handling Adult Offenders, 11.00 Sick/Injured Arrestees: "Officers arresting and/or

25   transporting arrestees who require medical attention shall transport the arrestee to UMC for

26

27        [14]Further, Chief Dyer testified that arrested people often lie about what they are doing.  PUMF No. 138.
28   Chief Dyer is familiar with the policies, practices and customs of the Fresno Police Department and sets policy for
     the Fresno Police Department.  See DUMF Nos. 76-77.

treatment.  Officers taking arrestees to UMC for treatment shall first complete the registration of the arrestee and then move the arrestee as directed by UMC staff."  Standing Order 2.5.1 Performance Standards, 01.06 Conscientiousness: "Members shall be conscientious in their work, prompt, and attentive to their duties.  Members shall always perform their duties to the best of their abilities."  DUMF No. 84; PUMF No. 114.  Standing Order 3.7.1 further indicates that officers are responsible for the safe delivery of arrestees, officers are to exercise due care and caution in transporting and processing arrestees to prevent personal injury of an arrestee for whom they are responsible, and that those arrested for felonies and who are in need of medical attention are to be accompanied by an officer who will stand by until completion of medical treatment or until hospital admission.  See PUMF No. 105, 112-115.  Standing Order 3.5.1 subsection 4.00 requires officers "making arrests of individuals for possession of drugs for sale, or for the actual sale of drugs, shall examine the arrestees for evidence of drug use.  Any evidence of use or non-use of drugs shall be included in the police report documenting the incident."  PUMF No. 100, 106.[15]  All Fresno police officers are instructed with respect to these policies.  DUMF No. 85.  Further, all Fresno police officers are daily supervised through a chain of command, receive yearly written evaluations through the chain of command, are expected to comply with all department policies, practices, and procedures, and are subject to discipline for failing to follow these policies, practices, and procedures.  See DUMF Nos. 86-90.

Eya Dean filed a tort claim with Fresno, which was denied.  Plaintiffs then filed suit in state court.  After various motions were ruled on in state court, including denials of summary judgment, an amended complaint was filed, which prompted Defendants to remove to this Court. In the operative complaint, Plaintiffs allege causes of action for: (1) Dean's Fourth Amendment right to be free from unreasonable seizure and excessive force; (2) Dean's Fourteenth Amendment right to medical treatment and Plaintiffs' Fourteenth Amendment right to familial relationships; (3) *Monell* inadequate training and supervision claims against Fresno; and (4) state law wrongful death.  See Court's Docket Doc. No. 1.  Defendants now move for summary

---

[15]Neither Chief Dyer nor Borrego appear to have been aware of this Standing Order.  See PUMF Nos. 108-110, 142.

judgment on the basis of no constitutional violations, federal qualified immunity, no negligence, and state law immunity.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the case turns on a mixed question of law and fact and the only dispute relates to the legal significance of the undisputed facts, the controversy for trial collapses into a question of law that is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the moving party meets it initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine Ins., 210 F.3d at 1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).  A fact is "material" if it might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A "genuine issue of material fact" arises when the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248-49; Thrifty Oil, 322 F.3d at 1046.

In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001).  However, the opposing party need not establish a material issue of fact conclusively in its favor.  It is

sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; Hopper v. City of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Rule 56(c); Fortyune, 364 F.3d at 1079-80. The court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Mayweathers v. Terhune, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exist or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  "A motion for

summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not

significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d

1177, 1183 (9th Cir. 2006).

## FEDERAL QUALIFIED IMMUNITY

Qualified immunity protects "government officials . . . from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982);

Phillips v. Hust, 477 F.3d 1070, 1079 (9th Cir. 2007); Brittain v. Hansen, 451 F.3d 982, 987 (9th

Cir. 2006).  The "concern of the immunity inquiry is to acknowledge that reasonable mistakes

can be made," and that it is "often difficult for an officer to determine how the relevant legal

doctrine will apply to the factual situation that he faces."  Estate of Ford v. Ramirez-Palmer, 301

F.3d 1043, 1049 (9th Cir. 2002).

A court employs a tiered analysis for determining qualified immunity.  See Saucier v.

Katz, 533 U.S. 194, 200-02 (2001); Skoog v. County of Clackamas, 469 F.3d 1221, 1229 (9th

Cir. 2006); Brittain, 451 F.3d at 987.   Under the first step, the court determines whether, "taken

in the light most favorable to the party asserting the injury, do the facts show the officer's

conduct violated a constitutional right?"  Saucier, 533 U.S. at 201; Phillips, 477 F.3d at 1079;

Skoog, 469 F.3d at 1229.  If the answer is "no," then the inquiry ends and the plaintiff cannot

prevail; if the answer is "yes," the court continues the analysis.  See Saucier, 533 U.S. at 201;

Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007); Johnson v. County of L.A.,

340 F.3d 787, 793-94 (9th Cir. 2003).

Under the second step, the court determines "whether the right was clearly established," and applies an "objective but fact-specific inquiry." Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see Saucier, 533 U.S. at 202; Brittain, 451 F.3d at 988.  The critical question is whether "the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates the right." Saucier, 533 U.S. at 202; Phillips, 477 F.3d at 1079.  In making this determination, the court considers the state of the law at the time of the alleged violation, but it is unnecessary for the precise conduct in question to have been previously held unlawful.  See Inouye, 504 F.3d at 712; Devereaux v. Perez, 218 F.3d 1045, 1052 (9th Cir. 2000).  Further, the court considers the "information possessed" by the officer at the time of his conduct.  See Hunter v. Bryant, 502 U.S. 224, 227 (1991); Anderson v. Creighton, 483 U.S. 635, 641 (1987); Edgerly v. City & County of San Francisco, 495 F.3d 645, 654 (9th Cir. 2007).  If the officer could have reasonably, but mistakenly, believed that his conduct did not violate a clearly established constitutional right, then the officer will receive qualified immunity. See Saucier, 533 U.S. at 205-06; Skoog, 469 F.3d 1229; Johnson, 340 F.3d at 794; Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001).  As a wholly objective inquiry, see Brittain, 451 F.3d at 988, the "'subjective beliefs' of the actual officer are . . . irrelevant." Inouye, 504 F.3d at 712; see Anderson, 483 U.S. at 641.  Thus, qualified immunity applies "if 'a reasonable officer could have believed [the action] to be lawful, in light of clearly established law and the information the . . . officer[] possessed.'" Lawrence v. United States, 340 F.3d 952, 956-957 (9th Cir. 2003); see also Hunter, 502 U.S. at 227.  Whether the law was "clearly established" and whether an officer could have a reasonable, albeit mistaken, belief that the conduct was lawful are questions of law for the court to decide when the pertinent material facts are

undisputed.  See Franklin v. Fox, 312 F.3d 423, 437 (9th Cir. 2002); LaLonde v. County of

Riverside, 204 F.3d 947, 953-954 (9th Cir. 2000); Neely v. Feinstein, 50 F.3d 1502, 1509 (9th

Cir. 1995); Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993).


### 1.    First Cause of Action – Violation of Dean's Fourth Amendment Rights

*Defendants' Argument*

Defendants argue that it was reasonable to stop Dean since his car was observed traveling

at a high rate of speed away from an area where gunshots had just been reported.  After Dean was

stopped, a consensual search occurred and rock cocaine was discovered.  Dean was arrested

without incident and there is no indication of excessive force.  Summary judgment is appropriate.

*Plaintiffs' Opposition*

After stating that Eya Dean has standing to bring a Fourth Amendment claim on behalf of

Dean, Plaintiffs simply state, without elaboration, that there are questions of fact and that

summary judgment is inappropriate.

*Discussion*

The complaint alleges that Borrego and Davis violated Dean's Fourth Amendment right

to be free from unreasonable seizure and excessive force.  See Complaint at ¶ 20.  Traffic stops

are seizures and subject to the Fourth Amendment's reasonableness requirement.  See United

States v. Arvizu, 534 U.S. 266, 273 (2002).  An investigatory traffic stop may be made on the

basis of reasonable suspicion.  United States v. Lopez-Soto, 205 F.3d 1101, 1104-05 (9th Cir.

2000).  At the time of the seizure, Borrego and Davis received two reports of gun shots being

fired: one from the radio/dispatch and another from a citizen while they were en route.  DUMF

Nos. 2, 3.  Almost immediately after receiving the report of gunshots from the citizen, the

officers saw Dean's car moving at "a high rate of speed" away from the area were shots were reported fired.  DUMF No. 4.  After the officers turned on their flashing lights, they noticed Dean moving and reaching around in the car.  DUMF No. 8.  The totality of these circumstances provided sufficient reasonable suspicion that Dean had been involved with the shots fired; the investigative stop or "seizure" of Dean's car was reasonable.[16]  See Arvizu, 534 U.S. at 273; Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Orman, 486 F.3d 1170, 1173 (9th Cir. 2007); Lopez-Soto, 205 F.3d at 1104-05.

Also, a "warrantless arrest of an individual in a public place for a felony, or misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause."  Maryland v. Pringle, 540 U.S. 366, 370 (2002).  Probable cause to arrest exists when the "facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person, or one of reasonable caution, to believe, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  Menotti v. City of Seattle, 409 F.3d 1113, 1149 (9th Cir. 2005); United States v. Puerta, 982 F.2d 1297, 1300 (9th Cir. 1992).  Upon discovery of the pager, money, rock cocaine, and vial with apparent rock cocaine residue, Borrego and Davis had probable cause to arrest Dean on drug related charges.  See DUMF Nos. 12, 14; Cal. Health & Safety Code §§ 11350, 11351.5, 11352; Menotti, 409 F.3d at 1149; Puerta, 982 F.2d at 1300.

Finally, the detention and arrest of Dean, in terms of excessive force, was nondescript as there were no control holds used, gunshots fired, non-lethal measures (for example pepper spray) used, or fighting/scuffling.  No evidence indicates that either Davis or Borrego used excessive

---

[16]Although the specific lines are not cited, Borrego's deposition testimony was that Dean was traveling over 40 m.p.h. in a 25 m.p.h. zone.  See Borrego Deposition at 14:2-8.  Thus, Dean's speed alone would provide reasonable suspicion for a traffic stop.

force.  Cf. Graham v. Connor, 490 U.S. 386 (1989).

Since the evidence shows reasonable seizures and no excessive force, there is no Fourth Amendment violation and the qualified immunity analysis ends.  See Saucier, 533 U.S. at 201. Summary judgment in favor of Defendants on this claim will be granted.


### 2.      Second Claim – Violation of Fourteenth Amendment Rights

### a.      Failure To Provide Medical Assistance

*Defendants's Argument*

Defendants argue that there is no evidence that the officers actually knew that Dean swallowed rock cocaine and then disregarded the risk it presented.  At some point in his conduct with the officers, it appears Dean swallowed rock cocaine to avoid arrest.[17]  However, at no point did Dean ever tell the officers (or anyone else) that he swallowed cocaine, even after he was told he was arrested cocaine possession and was shown the rock cocaine from the vomit.  Further, the officers did not observe any objective signs that Dean was under the influence of drugs and Dean did not indicate that he needed medical attention.  Dean gave an explanation for vomiting, and the officers observed Dean perform a number of activities without difficulty.   Dean's conduct and failure to request aide or say that he swallowed cocaine caused the officers to believe that Dean had hidden the rock cocaine in his mouth, instead of swallowing.  If the officers had known that Dean had swallowed cocaine, they would have obtained medical aid.  It is not enough to argue that they should have known that Dean swallowed cocaine.  Alternatively, qualified immunity is appropriate.  Given the above circumstances, a reasonable officer could have

---

[17]From the autopsy report, Dean likely swallowed the cocaine as he was making furtive movements just prior to being pulled over.  The autopsy report states that ingestion occurred at approximately 12:40 a.m.  Plaintiff's Exhibit E.  The officers made contact with Dean at 12:42 a.m.  DUMF No. 10.

believed that Borrego and Davis's conduct was legal.

_Plaintiffs' Opposition_

Plaintiffs argue that the evidence reflects deliberate indifference by Borrego and Davis. The officers were aware that Dean had vomited in their custody.[18]  Even though an explanation of "a bad drink" was given by Dean, Borrego did not smell alcohol and no further inquiry was made by Borrego.  The officers knew that Dean had been moving around suspiciously in his car before he actually pulled over.  Further, rock cocaine, a pager, money, and an empty vial with cocaine residue were discovered.  Dean was arrested for possession with intent to sell, yet had an empty vial.  The officers had every reason to know that Dean had swallowed cocaine to avoid arrest.  Fresno Police Chief Dyer testified that arrested people often lie when confronted by police and that police are trained to be suspicious of arrestees and of what arrestees say.  Even more egregious than not summoning medical assistance after Dean vomited, Borrego and Davis actually saw that there was rock cocaine in the vomit, yet they told no one, including the nurse at the jail.  Fresno police officers are responsible for safely transporting arrestees to jail and are required to report the medical conditions of an arrestee to the nurse so that she can make an informed judgment on whether to receive the arrestee or have the arrestee sent to the hospital. Chief Dyer expects officers to know that cocaine ingestion can cause death and are so trained. Dyer believes that Borrego and Davis showed poor judgment by not reporting that they found cocaine in vomit.  Roger Clark has declared that the circumstances surrounding the detention, arrest, and transfer would have alerted any reasonable police officer that medical aide should be summoned.  Accordingly, summary judgment should be denied.

---

[18]Plaintiffs indicate that Dean vomited twice, but the undisputed facts presented to the Court indicate that Dean vomited in the car and then shortly thereafter had dry heaves.  See DUMF Nos. 18-21.  Plaintiffs' expert Dr. Frawley states that Dean vomited twice, but he was not present and there is no citation in his declaration to support this assertion.

*Legal Standard*

Claims for failure to provide adequate care for serious medical needs, when brought by a detainee who has been neither charged nor convicted of a crime, are analyzed under the substantive due process clause of the Fourteenth Amendment rather than the Eighth Amendment. See Lolli v. County of Orange, 351 F.3d 410, 418 (9th Cir. 2003); Gibson v. County of Washoe, 290 F.3d 1175, 1185-86 (9th Cir. 2002.); Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998). The Fourteenth Amendment "imposes, at a minimum, the same duty the Eighth Amendment imposes: persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs." Gibson, 290 F.3d at 1187.  Thus, Eighth Amendment standards are utilized in evaluating the claims of pretrial detainees.  See Lolli, 351 F.3d at 419; Frost, 152 F.2d at 1128.  To prove an inadequate medical care claim, a plaintiff must show that he was: (1) confined under conditions posing a risk of objectively, sufficiently serious harm; and (2) that the officials had a sufficiently culpable state of mind in denying the proper medical care, i.e. officials acted with deliberate indifference to a serious medical need.  See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Lolli, 351 F.3d at 419.  A medical need is serious "if the failure to treat the [detainee's] condition could result in further significant injury or the unnecessary and wanton infliction of pain." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991).[19]  Under the deliberate indifference standard, a defendant will be liable for denying needed medical care only if he "knows of and disregards an excessive risk to [a detainee's] health and safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Lolli, 351 F.3d at 419; Gibson, 290 F.3d at 1187.  The indifference to serious medical needs must be "substantial" and "[m]ere indifference, negligence, or medical malpractice" is insufficient.

---

[19]*McGuckin* was overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980).  "In order to know of the

risk, it is not enough that the person merely 'be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, [] he must also draw that inference.'"  Lolli,

351 F.3d at 419; Gibson, 290 F.3d at 1187.  Deliberate indifference may be shown by direct or

circumstantial evidence.  See Lolli, 351 F.3d at 419.  When a defendant is actually aware of a

substantial risk of serious harm, deliberate indifference may be reflected through either action or

inaction such as denial, delay, or intentional interference with medical treatment.  See Lolli, 351

F.3d at 419; Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002).  However, a delay in receiving

treatment, alone and without any harm, will not support a claim.  McGuckin, 974 F.2d at 1060.

### *Discussion*

The first step in the qualified immunity analysis is to determine whether the facts, when

viewed in the light most favorable to the plaintiff, show a constitutional violation.  Initially, there

does not appear to be a dispute that Dean actually had a "serious medical condition" because he

swallowed or ingested a sufficiently "lethal" amount of cocaine.  See McGuckin, 974 F.2d at

1059; DUMF No. 45; PUMF Nos. 191, 192, 210, 214, 217; Plaintiffs's Exhibit E.  Plaintiffs

appear to argue that Dean's right to medical care was violated from two points:  after Dean

vomited and after Borrego found the pieces of rock cocaine in Dean's vomit.

With respect to not summoning medical aid when Dean vomited, the Court does not

believe that the evidence shows a constitutional violation.  The evidence needs to support a

finding that the officers actually knew that Dean had a serious medical need.  See Lolli, 351 F.3d

at 419; Gibson, 290 F.3d at 1187.  Plaintiffs' argument, however, is more consistent with the

proposition that Borrego and Davis should have suspected that Dean had swallowed cocaine.

Plaintiffs point to the "furtive movements" of Dean in his car, the rock cocaine found on Dean's

20

person, the empty vial with apparent cocaine residue, and vomiting and then indicate that a reasonable officer should have known that medical aide should have been summoned.  See Plaintiff's Opposition at 14.  That the officers should have known or that a reasonable officer would have suspected is the language of negligence; it does not establish actual knowledge of a serious medical condition.[20]  See Lolli, 351 F.3d at 419; Broughton, 622 F.2d at 460.  The evidence does not indicate that Borrego and Davis actually knew that Dean had swallowed rock cocaine at that point.  Prior to vomiting, there is no evidence that Dean was in any physical distress or was ill in any way.  The officers did not make any objective observations that would have led them to believe that Dean was under the influence of a controlled substance.  The only sign of illness or physical distress exhibited by Dean was vomiting and shortly thereafter dry heaves.  After vomiting and dry heaving, Dean said he was "fine," responded and conversed normally, behaved in a normal fashion, did not say again that he felt ill, did not vomit or dry heave again, did not request medical attention, gave an explanation for vomiting, and did not say that he had swallowed rock cocaine.  Vomiting in and of itself is not a serious medical condition.  Further, the officers have declared that they thought that Dean had hidden the rock cocaine in his mouth and if Dean had informed them that he had swallowed cocaine, they would have summoned medical aide.  Cf. Lolli, 351 F.3d at 421 (holding that the officers' "indifference to Lolli's extreme behavior, his obviously sickly appearance and his explicit statements that he needed food because he was a diabetic could easily lead a jury to find that the officers consciously disregarded a serious risk to Lolli's health.").  The behavior of Dean and the testimony of Borrego and Davis do not show that Borrego and Davis actually knew that Dean

---

[20]Plaintiffs also cite testimony from Chief Dyer and Sergeant Tucker about what an officer should do, what they would have done, or what officers are expected to do.  Again, this is the language of negligence and, in light of the totality of the circumstances, does not support a finding of actual knowledge of Borrego and Davis.  See Lolli, 351 F.3d at 419; Broughton, 622 F.2d at 460.

had a serious medical condition.  At best, the circumstances suggest that the officers should have suspected that Dean had swallowed cocaine; it is not strong enough to support a finding that the officers actually knew that Dean had swallowed cocaine when Dean vomited in the patrol car. Thus, the officers did not violate Dean's Fourteenth Amendment right to medical care when they did not obtain medical aide for Dean after Dean vomited in the patrol car.

        With regard to the second time frame, viewed in the light most favorable to Plaintiffs, the evidence indicates that a constitutional violation occurred.  As discussed above, Dean moved furtively before the stop, was found with rock cocaine, money, and a pager, an empty vial with apparent cocaine residue was found in the car, and Dean vomited.  After a transportation wagon was summoned, Dean was taken to headquarters for processing at 1:16 a.m.  At headquarters, Borrego examined the vomit in the patrol car and found between four and seven pieces of rock cocaine.  Borrego stated that he had begun to suspect that, considering the empty vial, Dean may have either hidden rock cocaine in his mouth or ingested it.  Borrego showed Davis the pieces and told Dean that the rock cocaine had been found.  Dean was then booked and driven to the County Jail at 2:24 a.m.  At the jail, neither Borrego nor Davis informed the jail nurse that Dean had vomited and that rock cocaine was found in the vomit.  Sometime after 2:48 a.m., Borrego told Sergeant Tucker that Dean had swallowed cocaine.[21]  Also, Chief Dyer testified, and Borrego and Davis acknowledged, that Fresno police officers are trained to render medical aid, contact emergency medical services, and/or transport a person to the hospital if they believed that the person had swallowed rock cocaine.  In light of these circumstances, especially the discovery of rock cocaine in the vomit, a rationale jury could reasonably infer that the officers knew that Dean had swallowed rock cocaine and had a serious medical condition.  Cf. Lolli, 351 F.3d at

--------

[21]The contours and specifics of the exchange between Tucker and Borrego are not clear.

419.  Further, deliberate indifference may be shown through inaction and through withholding medical treatment.  See Lolli, 351 F.3d at 419; Hallett, 296 F.3d at 744. This is not a case like *Lolli* where a detainee requested care and was denied.  Nevertheless, Borrego and Davis did not render care themselves, did not call for paramedics, did not take Dean to the hospital, and did not report discovery of the rock cocaine in the vomit to the jail nurse.  Dr. Frawley's declaration indicates that if Dean had received medical care while he was conscious, he would likely not have died.  A rationale jury could find the officers' conduct to be a form of inaction that amounts to deliberate indifference.  Although the officers maintain that they only thought that Dean had cocaine in his mouth, that they did not think that Dean needed medical care, and that if Dean had said that he had swallowed cocaine that they would have obtained medical aid, a rationale jury could look at the totality of the circumstances and conclude that the officers had actual knowledge that Dean had swallowed cocaine and were deliberately indifferent to Dean's condition.

Since the evidence indicates a constitutional violation, the Court proceeds to the second tier of the immunity analysis.  See Estate of Ford, 301 F.3d at 1049-50 (holding that under *Saucier*, an officer may have qualified immunity even if a violation of the Eighth Amendment occurred); Rosado v. Alameida, 497 F. Supp. 2d 1179, 1193 n.3 (C.D. Cal. 2007) .  The second step of the qualified immunity analysis is an objective standard that does not consider the subjective beliefs of the officers involved.  See Anderson, 483 U.S. at 641; Inouye, 504 F.3d at 712; Brittain, 451 F.3d at 988.  Because a reasonable "official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high,".  Estate of Ford, 301 F.3d at 1050 (citing Saucier, 533 U.S. at 205), qualified immunity is still available.

The Defendants' encounter with Dean occurred on December 16, 2002.  DUMF No. 1.
The general right of pre-trial detainees under the Fourteenth Amendment to not have their serious
medical conditions treated with deliberate indifference was established prior to December 2002.
See, e.g., Frost, 152 F.3d at 1128.   However, it is not enough to generally define the right in
question, rather the contours of the right must be viewed in light of the circumstances
confronting Borrego and Davis.  See Inouye, 504 F.3d at 712; Skoog, 469 F.3d at 1229-30.  As of
December 2002, the Court is unaware of any Ninth Circuit cases that involved a situation where
officers found rock cocaine or drugs in vomit or knew that a pre-trial detainee had swallowed
cocaine, but did not obtain medical aid.  Further, the parties have not identified any such cases.
However, although not quite on all fours with the case at bar, the Court has found one similar
case from the Sixth Circuit.  See Watkins v. City of Battle Creek, 273 F.3d 682 (6th Cir. 2001).

In *Watkins*, police officers executed a search warrant at 2:20 a.m. at the apartment of
Ralph Watkins.  See id. at 684.  The police found Watkins exiting the walk-in closet of his
bedroom.  See id.  A torn plastic bag with white crumbs sprinkled around it was found on the
floor of the closet.  See id.  A larger piece was found nearby and was later identified as crack
cocaine.  See id.  Watkins was handcuffed and moved to the living room.  See id.  Several
officers saw Watkins licking his lips and a pink foamy drool coming from his mouth, and one
officer saw a white speck near Watkins's mouth.  See id.  The officers asked Watkins if he had
swallowed drugs, warned him of the dangers of swallowing drugs, and stated he would not face
additional charges.  See id.  Watkins denied swallowing drugs.  See id.  Watkins explained the
licking and discharge by stating that he had knocked his teeth against the bed in the process of
handcuffing.  See id.  The officers did not inform their supervisors or jail personnel of what they
had observed or that Watkins had denied swallowing drugs.  Id.  Watkins was transported to the

Calhoun County Jail at about 3:30 a.m.  See id.  At the jail, Watkins complained of an upset

stomach, appeared to be drunk or high, fell from a chair onto the floor, and was observed making

chewing motions with his mouth.  See id.  Sheriff's employees asked if he had swallowed drugs

and Watkins was again told that he would not face additional charges, but Watkins continued

denying swallowing drugs.  See id. at 684-85.  Watkins explained that his stomach was upset

from drinking alcohol and smoking marijuana.  See id. at 685.  Jail employees checked his mouth

for injury and to insure nothing was in it.  See id.  When Watkins got up to enter intake, he

grabbed his stomach and bent over like he was about to vomit.  See id.  Watkins lowered himself

to the ground and was later taken to a cell.  See id.  About five minutes later, Watkins called a

deputy and said he felt sick.  See id.  Several officers checked on Watkins and saw him either

standing, moving about the cell, or sitting.  See id.  At 5:30 a.m. Watkins was found behind a

privacy wall and without a pulse.  See id.  He was pronounced dead shortly thereafter.  See id.

The Sixth Circuit acknowledged that pre-trail detainees have a right to medical treatment, that

the right is analogous to th Eighth Amendment but comes from the Fourteenth Amendment, and

that the right is violated when officials act with deliberate indifference to serious medical needs.

See id. at 685-86; cf. Lolli, 351 F.3d at 419.  After stating that actual knowledge by a defendant

is required, the Sixth Circuit held that Watkins's rights were not violated.  See Watkins, 273 F.3d

at 686.  The Sixth Circuit explained:

> [I]t is not enough for plaintiff to demonstrate a question of fact whether the police
> officers or sheriff's deputies should have known that Watkins had swallowed
> drugs. We find the evidence was not sufficient to lead a rational trier of fact to
> conclude that the officers or jailers knew Watkins needed medical attention for
> swallowing drugs. None of the police officers at the apartment saw Watkins
> swallow drugs. When the possibility was raised as a result of his drooling, the
> officers took care to advise Watkins that ingesting drugs could be deadly, that they
> would take him for medical treatment, and that he would not face any additional
> charges if he had swallowed drugs. Watkins repeatedly denied swallowing drugs,
> provided rational explanations for his behavior, and did not want medical

treatment. He did not say anything about swallowing drugs to the transport officer,
who was an acquaintance, but instead was concerned that she would think badly
of him for being arrested.

In spite of having no forewarning, jail personnel reacted to Watkins's behavior
and asked him if he had swallowed any drugs. They also assured him both that he
would not face additional charges and that they would get him medical treatment
if he had swallowed any drugs. Watkins continued to deny the need for medical
treatment and offered an explanation for why he was feeling sick to his stomach. .
. . Watkins was . . . kept under observation and his movements were noted by
other officers. This case does not involve an incapacitated detainee or one who
asked for but was refused medical treatment. Plaintiff faults defendants for not
forcing medical treatment on Watkins in the face of his repeated denials and
plausible explanations. We find that this is insufficient to establish a question of
fact on the issue of deliberate indifference. Summary judgment was properly
entered in favor of defendants on these claims.

Watkins, 273 F.3d at 686.

In light of *Watkins* and the circumstances that they confronted, Borrego and Davis are

entitled to qualified immunity.   The *Watkins* court held that no violation of the Fourteenth

Amendment occurred based largely on Watkins' own conduct and despite significant evidence

that cocaine had been swallowed.   See id.   Although not identical, Dean's behavior is similar to

Watkins's behavior.   Neither Borrego nor Davis saw Dean swallow the rock cocaine.   Both

Watkins and Dean gave an inaccurate reason to explain their respective conditions instead of

stating that they had swallowed cocaine –  Watkins said that he knocked his teeth and had taken

alcohol and marijuana, and Dean said that he had a "bad drink."  Watkins refused medical

treatment, while Dean never requested medical treatment.  Both Watkins and Dean had very little

to lose by admitting to swallowing the cocaine since officers had assured Watkins that no new

charges would be brought against him,[22] and Dean was already being arrested for felony

possession and had been so informed.  Nevertheless Watkins denied swallowing cocaine and

---

[22]It unknown what charges Watkins was facing.

Dean sat silent when confronted by Borrego that pieces of rock cocaine had been found in the vomit.  Further, neither Borrego and Davis nor the *Watkins* officers informed their supervisors or jail personnel regarding the respective suspects' condition prior to seizures/death.  The Sixth Circuit found no constitutional violation.

Additionally in this case, it does not appear that very much time elapsed between Dean's "furtive movements" in his car and his vomiting in the patrol car.  After Dean vomited, he told Borrego that he was feeling ill again.  Borrego opened the door and Dean dry heaved.  This sequence occurred in less than one half hour after Dean was stopped (Dean was stopped at 12:42 a.m. and taken to headquarters at 1:16 a.m.).  Although apparently not the case, a reasonable officer could interpret the dry heaves as meaning that Dean's stomach was empty.  Further, after Dean dry heaved, he repeatedly told Borrego that he was fine in response to Borrego's questions.  Dean did not thereafter tell Borrego that he was feeling ill again or was having any further or continued symptoms.  It is reasonable to believe that Dean would again voice his symptoms if he was continuing to feel ill.

Also, whereas Watkins exhibited signs of being drunk or high as his detention progressed, Dean did not.  In fact, Dean's behavior post-dry heaving appears to have been perfectly normal and does not indicate any distress.  Before the rock cocaine was found in the vomit, Dean was standing without problem, conversing or at least responding to Borrego in a normal and coherent fashion, and was able to enter the transportation wagon without difficulty.  At no time did the officers think that Dean was high, and after dry heaving, Dean exhibited no further signs of physical distress.

Borrego found the rock cocaine in the vomit after they had arrived at police headquarters.  Again, Dean did not admit to swallowing the cocaine, request medical care, or say anything when

Borrego told him that rock cocaine had been found in the vomit.  Finding the pieces of rock cocaine in the vomit is consistent with either Dean swallowing the cocaine or Dean hiding it in his mouth.  Further, if Dean had swallowed the cocaine during the furtive movements prior to being stopped, the time between likely ingestion and vomiting appears to have been short.  In light of the dry heaves, it would be reasonable to conclude that if cocaine had been ingested, it had not been in Dean's system for very long.

At headquarters, Borrego and Davis observed Dean get processed, fingerprinted, and photographed.  Dean again confirmed to Borrego that he was fine.  Dean appears to have acted normally, did not appear to be in distress, and was processed without incident.

Borrego and Davis then drove Dean to the jail and they arrived at 2:24 a.m., well over an hour after Dean had vomited and dry-heaved.  In that period of time, Dean showed no signs of physical distress, was coherent, behaved normally, stated he was fine on multiple occasions, did not act drunk or high, did not state that he swallowed rock cocaine despite Borrego's discovery, never requested medical treatment, and never stated that he felt ill.  When the officers left Dean at the jail, they understood that a medical screening was the first thing that would occur and that any symptoms or problems could be communicated to the nurse.  Since Dean was previously communicative of his symptoms to the officers, there is no reason to think that he would not be communicative to the nurse if he was experiencing new or continued symptoms.

Given the *Watkins* decision, Dean's own conduct and the totality of the circumstances, a reasonable officer could reasonably believe that Dean did not need medical attention despite swallowing rock cocaine.  See Watkins, 273 F.3d at 686.  Considering the dry heaves and the time period involved from the stop to vomiting, a reasonable officer could have concluded that the rock cocaine was not in Dean's system for a significant period of time.  Moreover, prior to

vomiting and after dry-heaving, Dean stated he was fine, acted normal, did not express further symptoms, and exhibited no signs of being high or in physical distress.  A reasonable officer in Borrego and Davis's position, and with their knowledge of the facts, could "mistakenly, but reasonably, perceive that the exposure [to Dean] was not that high."  Estate of Ford, 301 F.3d at 1050; see also Saucier, 533 U.S. at 205-06; Skoog, 469 F.3d at 1229; Johnson, 340 F.3d at 794; Lawrence, 340 F.3d at 956-57; Jackson, 268 F.3d at 651.   Borrego and Davis are entitled to qualified immunity because a reasonable officer in their position could reasonably conclude that their conduct did not violate Dean's Fourteenth Amendment right to medical care in this case.[23]

**b.     Interference With Familial Relationships**

There is a Fourteenth Amendment substantive due process right to familial relationships.  See Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001).  However, for the same reasons that Borrego and Davis are entitled to qualified immunity for the Fourteenth Amendment medical care claim, Borrego and Davis are entitled to qualified immunity for Plaintiffs' Fourteenth Amendment familial relationships claim.

**3.     Third Claim – _Monell_ Liability of the City of Fresno**

_Defendant's Argument_

Fresno argues that since there is no constitutional violation, there can be no liability.

---

[23]Plaintiffs' expert, Roger Clark, opines that the need for obtaining medical treatment for Dean would be obvious to any competent officer and the failure to do so fellow below POST standards and the standards articulated by Chief Dyer.  See Clark Declaration at ¶¶ 23-25.  However, where, as here, the pertinent material facts are not disputed, whether a reasonable officer in the Defendants' shoes could reasonably believe that his conduct was constitutional is a question of law for the Court.  See Franklin, 312 F.3d at 437; LaLonde, 204 F.3d at 953-54; Neely, 50 F.3d at 1509; Act Up! Portland, 988 F.2d at 873.  Expert opinion on this matter constitutes an improper legal conclusion.  See Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 n.11 (1st Cir. 1997); Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995); Aguilar v. International Longshoreman's Union Local # 10, 966 F.2d 443 (9th Cir. 1992); see also Carswell v. Borough of Homestead, 381 F.3d 235, 243-44 (3d Cir. 2004); K.S. v. Board of Douglas County Comm'rs, 2002 U.S. Dist. LEXIS 17045, *20 (D. Kan. 2002).

Alternatively, Fresno argues that it has no policies or customs that constitute deliberate indifference to constitutional rights.  Police officers are daily supervised through a chain of command, regularly evaluated and disciplined for failing to comply with standing orders and policies.  Further, police officers receive on-going and continuing training, which includes requesting aid for persons in medical distress, recognizing the need for medical care, and efforts suspects take to hide contraband, and obtaining medical aid for those whom they reasonably believe have swallowed controlled substances.

*Plaintiffs' Opposition*

Plaintiffs argue that municipalities may be liable based on policies of omission.  A jury may infer deliberate indifference when a "municipal actor" disregards a known or obvious consequence of his action.  Both Borrego and Davis "testified that they knew ingestion of cocaine could cause serious harm and despite knowing that Mr. Dean's vomit contained rocks of cocaine they were deliberately indifferent and failed to call for medical assistance."  Plaintiffs' Opposition at 16:9-11.

Further, neither Borrego nor Davis acted reasonably.  Although Chief Dyer testified that arrestees often lie, Borrego and Davis unreasonably believed Dean when he said he was fine.  Borrego and Davis also unreasonably failed to tell the jail nurse about the rock cocaine and vomiting.  Sergeant Tucker and Chief Dyer are critical of Borrego and Davis and believe that the circumstances should have raised a red flag.  This evidence shows that Fresno's officer training is wholly inadequate in addressing the life-threatening consequences of cocaine ingestion and also the procedures to be followed when arresting a person for possession and sale of cocaine.  Although Fresno has rules in place to safeguard arrestees, officers are not trained with regard to these rules.  Neither Borrego, Davis, nor Chief Dyer knew that Standing Order 3.5.1 required

officers to examine persons for evidence of drug use when those persons arrested for drug sales.

Thus, summary judgment must be denied.

### Legal Standard

Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be liable for causing a constitutional deprivation.  Monell v. Department of Soc. Servs., 436 U.S. 658, 690 (1978); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).  A municipality, however, "cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior* theory."  Monell, 436 U.S. at 691; see Long, 442 F.3d at 1185; Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002).  Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  Monell, 436 U.S. at 694; Ulrich, 308 F.3d at 984.  A "policy" is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Long, 442 F.3d at 1185.  A policy or custom under *Monell* may be shown through: (1) a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity; (2) the decision of a decision-making official who was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) when an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.  Menotti v. City of Seattle, 409 F.3d 1113, 1147 (9th Cir. 2005); Ulrich, 308 F.3d at 984-85.

A municipality's failure to train its employees may create § 1983 liability where the

"failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989); Long, 442 F.3d at 1186; Lee v. City of Los Angeles, 250 F.3d 668, 681 (9th Cir. 2001). "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." Long, 442 F.3d at 1186. A plaintiff alleging a failure to train police officers must show: (1) he was deprived of a constitutional right, (2) the municipality had a training policy that "amounts to deliberate indifference to the [constitutional] rights of the persons with whom [its police officers] are likely to come into contact;" and (3) his constitutional injury would have been avoided had the municipality properly trained those officers. Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007); Lee, 250 F.3d at 681. A municipality is "deliberately indifferent" when the need for more or different action, "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers … can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390; Lee, 251 F.3d at 682. A "pattern of tortious conduct," despite the existence of a training program, or "highly predictable" constitutional violations due to a "failure to equip law enforcement officers with specific tools to handle recurring situations," are circumstances in which liability for failure to train may be imposed. See Board of County Comm'rs v. Brown, 520 U.S. 397, 407-10 (1997); Long, 442 F.3d at 1186-87. However, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." City of Canton, 489 U.S. at 391; see Merritt v. County of Los Angeles, 875 F.2d 765 770 (9th Cir. 1989) ("Mere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on the County."). "A plaintiff cannot demonstrate the existence of a

32

municipal policy or custom based solely on a single occurrence of unconstitutional action by a non-policymaking employee." McDade v. West, 223 F.3d 1135, 1141 (9th Cir. 2000).

*Discussion*

With respect to the Fourth Amendment claim, since Borrego and Davis did not violate Dean's Fourth Amendment rights, there can be no municipal liability on this claim. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Jackson, 268 F.3d at 653-54. However, because the evidence could support a violation of the Fourteenth Amendment when viewed in the light most favorable to Plaintiffs, the Court proceeds to review Plaintiffs' *Monell* claim.

Plaintiffs have failed to establish any policies or customs by Fresno that amount to deliberate indifference to constitutional rights. First, Plaintiffs' argument regarding omissions by Fresno is unpersuasive. The only omissions identified by Plaintiffs are by Borrego and Davis. Plaintiffs have identified no omissions by Fresno, let alone an omission that "reflects a 'deliberate' or conscious choice' to countenance the possibility of a constitutional violation." Gibson, 290 F.3d at 1194. Further, Borrego and Davis are police officers, and there is no evidence that they are policymakers or sufficiently high in the Fresno hierarchy such that their conduct can be considered the official policy of Fresno. See Monell, 436 U.S. at 694; McDade, 223 F.3d at 1141; Ulrich, 308 F.3d at 985. At most, Plaintiffs have shown that they were injured by an employee of Fresno, which is simply *respondeat superior* and thus, an insufficient basis for municipal liability. See Brown, 520 U.S. at 407; Monell, 436 U.S. at 690; Long, 442 F.3d at 1185; Menotti, 409 F.3d at 1147; Ulrich, 308 F.3d at 984-85.

With respect to inadequate training, Plaintiffs have not met their burden. The undisputed evidence shows that Fresno police officers receive police academy training, field training

programs, on the job training, advanced officer courses, and various classes and seminars.  See

DUMF No. 79.  Fresno police officers are particularly trained:  (1) to conduct evaluations to

determine if a person is under the influence of a controlled substance, including rock cocaine (for

those officers involved in narcotics investigations); (2) request aid for persons in need of medical

care; (3) to recognize an arrestee's need for medical care and provide such care; (4) to be aware

of efforts suspects may make to hide controlled substances, including putting such substances in

their mouths; (5) to render medical aid, contact emergency medical services or transport the

suspect to the hospital if they have a reasonable belief that a suspect has swallowed a controlled

substance, such as rock cocaine; (6) to know that ingestion of cocaine can cause death; (7) to

know that arrested persons may have evidence in their mouth; (8) to know that persons arrested

on drug charges may attempt to conceal the illegal drugs on their person; and (9) to be suspicious

of those arrested and what the arrestees say.  DUMF No. 82-83; PUMF Nos. 139-140, 147-

149,161.  There are also Standing Orders that cover officer conduct with regards to ill or injured

arrestees.  See DUMF No. 84; PUMF No. 105, 112-115.  Further, police officers are to report the

medical condition of an arrestee to the jail nurse.  See PUMF No. 155.  Borrego and Davis have

declared that they received academy training, received their Basic POST certificate, and received

training through Fresno, which included obtaining medical care for those who ingest drugs and

knowing that persons try to hide drugs, sometimes in their mouth.  See DUMF Nos. 49, 52, 56-

58.  Plaintiffs do not show how this training is/was improper or inadequate, do not indicate what

proper training would be, have not shown that there is an ongoing pattern of violations of the

right to medical care of detainees who have swallowed a controlled substance, and have failed to

show that the training is so obviously deficient that a constitutional violation can be reasonably

expected to occur.  Plaintiffs essentially rely on the conduct of Borrego and Davis.  However, this

evidence only reflects "a single incident of errant behavior," <u>Merritt</u>, 875 F.2d at 770, the fact

that mistakes or negligence occurred in this case "says little about [Fresno's] training program or

the legal basis for holding [Fresno] liable."[24] <u>City of Canton</u>, 489 U.S. at 391; <u>see also</u> <u>McDade</u>,

223 F.3d at 1141.

Plaintiffs have failed to identify any shortcomings in the training provided by Fresno and

failed to show that Fresno has a training policy that amounts to deliberate indifference to the

constitutional rights of the persons with whom its police officers are likely to come into contact.

<u>See</u> <u>City of Canton</u>, 489 U.S. at 390-91; <u>Blankenhorn</u>, 4xx F.3d at ; <u>Long</u>, 442 F.3d at 1186-87.

Summary judgment on Plaintiffs' <i>Monell</i> claim is appropriate.

**4.      State Law Claims**

This Court has supplemental jurisdiction over Plaintiffs' state law claims.  Under 28

U.S.C. § 1367(c)(3), a district court may decline to exercise jurisdiction over supplemental state

law claims if "the district court has dismissed all claims over which it has original jurisdiction."

The general rule is "when federal claims are dismissed before trial . . . pendent state claims

should also be dismissed."   <u>Religious Tech. Ctr v. Wollersheim</u>, 971 F.2d 364, 367-68 (9th Cir.

1992); <u>Scholar v. Pacific Bell</u>, 963 F.2d 264, 268 n.4 (9th Cir. 1992); <u>Schultz v. Sundberg</u>, 759

F.2d 714, 718 (9th Cir. 1985).  When removal is based on the presence of a federal cause of

action, a district court may remand pendent or supplemental state law claims to the state court

once the federal claims have been eliminated.  <u>See</u> <u>Lee v. City of Beaumont</u>, 12 F.3d 933, 936

---

[24]Plaintiffs point out that Borrego, Davis, and Chief Dyer where unaware of Standing Order 3.5.1, which required that all persons arrested of drug possession to be examined for signs of being under the influence. However, Plaintiffs have not shown that the training method for instructing officers on this standing order was inadequate or that this standing order is even necessary for officers to be considered "adequately trained."  Further, Borrego and Davis did not believe that Dean was under the influence of a controlled substance.  <u>See</u> DUMF No. 81.

(9th Cir. 1993).  In fact, "it is generally preferable for a district court to remand remaining pendent claims to state court."  Id.  Since all federal claims have been resolved and only state law claims remain, the Court will remand the remaining state law claims to the Fresno County Superior Court.  See Schultz, 759 F.2d at 718.

## CONCLUSION

Defendants move for summary judgment on all claims.  As to Plaintiffs' First Cause of Action, Borrego and Davis had reasonable suspicion to seize Dean.  Further, upon discovery of the pager, money, rock cocaine, and empty vial with apparent residue, they had probable cause to arrest Dean.  There is no indication whatsoever of excessive force.  Since Dean was not seized or arrested or subject to excessive force in violation of the Fourth Amendment, summary judgment is appropriate.

As to Plaintiffs' Second Cause of Action for violation of Dean's Fourteenth Amendment right to medical care, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that Borrego and Davis were deliberately indifferent to Dean's serious medical condition.  However, given the totality of the circumstances, and in particular the conduct of Dean, a reasonable officer in Borrego and Davis's position could reasonably conclude that the risk faced by Dean was not high and that Borrego and Davis's conduct was not unconstitutional.  Borrego and Davis are therefore entitled to qualified immunity.  The same reasoning and result applies to Plaintiffs' individual Fourteenth Amendment familial relationships claim.  Summary judgment on the Second Cause of Action is appropriate.

As to Plaintiffs' Third Cause of Action for *Monell* liability, Plaintiffs have failed to identify how Fresno's training was improper and failed to show that Fresno's training policies reflect deliberate indifference.  Summary judgment on this claim is appropriate.

Finally, since all federal claims have been resolved, the Court declines to exercise supplemental jurisdiction and will remand the remaining state claims to the Fresno Superior Court.

Accordingly, IT IS HEREBY ORDERED that:

1.    Summary judgment in favor of Defendants on Plaintiffs's First, Second, and Third Causes of Action is GRANTED;

2.    All currently set dates and deadlines, including the trial and pre-trial conference dates, are VACATED; and

3.    This case is REMANDED forthwith to the Fresno Superior Court.


IT IS SO ORDERED.

**Dated:   February 11, 2008**              **/s/ Anthony W. Ishii**
                                          UNITED STATES DISTRICT JUDGE